UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO: 07-0374 |
| ANTONNIO PICKETT | SECTION: "S" (1) |

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that Antonnio Pickett's motion to suppress evidence and statements is **DENIED**. (Document #23.)

### I. BACKGROUND

Antonnio Pickett was employed by Chet Morrison Contractors, Inc. as a commercial diver working off of the CM15, a 220' pipe lay/bury barge. The CM15 was located in international waters at Main Pass 296, an oil and gas production site on the Outer Continental Shelf.

The underlying facts are essentially undisputed. On July 2, 2007, Pickett left the CM15 and boarded an offshore supply vessel. He traveled with five other passengers a distance of approximately 30 miles for three hours from Main Pass 296 through international waters into territorial waters to the Martin-Mid-Stream Dock in Venice, Louisiana.[1]

---

[1] The defendant and the government stipulated that those aboard the supply vessel crossed international waters when leaving the barge and docking at Venice. They re-entered the

Pickett had come to the attention of Immigration and Customs Enforcement (ICE) as they investigated crimes involving child exploitation and pornography.  Pickett had purchased two 30-day subscriptions to websites containing child pornography between December 2006 and January 2007.[2]  Senior Special Agent Christopher Anderson believed that Pickett downloaded images from the sites to his computer.  Anderson determined that the Houma Police Department had an outstanding warrant for domestic violence and that Pickett would return to shore on July 2, 2007.  A team of two ICE agents, four customs agents, and two Plaquemines Parish Sheriff's deputies met Picket at the dock in Venice as he debarked from the crew boat.[3]  ICE agents conducted a "secondary customs inspection" of Pickett and five co-workers.  Pickett was carrying two lap-top computers in a backpack, three thumb drives, and a portable hard drive.  Relying on the border search exception to the warrant requirement, ICE Agent Steven Powell viewed the contents of the thumb drives, portable hard drive, and memory card on one of the laptop computers and discovered child pornography images.[4]  Agent Powell and Agent John Schmidt accompanied Pickett to the office area at the dock, read his Miranda[5] rights, and questioned him.  Pickett admitted that he downloaded the child pornography from the Internet,

---

territorial waters when they reached a point three miles from the coast.

   [2]   Def.'s exh. 3, Anderson affidavit ¶¶ 18, 19.

   [3]   Id. at ¶¶ 21, 22, 23.

   [4]   Id. at ¶ 24.

   [5]   Miranda v. Arizona, 86 S.Ct. 1602 (1966).

but said he thought it was legal because it was free.[6]  Picket signed a consent-to search form for his laptops, but agents had technical difficulties in viewing images.  The ICE agents obtained a warrant to search Pickett's computers and computer equipment.

The grand jury charged Pickett with knowing possession of one or more matters, that is, computer hard drives, computer media containing digital images, computer images, and digital video files, which were produced using materials shipped in interstate and foreign commerce, the production of which involved the use of a minor engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), in violation of 18 U.S.C. § 2252(a)(4)(B).

Pickett filed a motion to suppress all child pornography images found on the computers, thumb drives or computer equipment seized from him on July 2, 2007, and any statements made by him to law enforcement officers on that date.  Pickett also seeks the suppression of the fruits of the illegal warrantless search, including the fruits of a subsequent search pursuant to a warrant.

On July 16, 2008, the court held an evidentiary hearing and granted the parties the opportunity to file supplemental memoranda.

## II. DISCUSSION

Pickett contends that the Fourth Amendment requires law enforcement officers to obtain a warrant, supported by probable cause, before searching his computer and computer-related equipment.  Pickett argues that the border search exception to the warrant requirement does not apply because he did not cross a border when he arrived in Venice from his base of operations on

---

[6] Id. at ¶ 26.

the Outer Continental Shelf, which is a federal enclave.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." United States Constitution, amend. IV. "[W]arrantless searches and seizures are unreasonable *per se* unless they fall within a few narrowly defined exceptions." United States v. Rivas, 157 F.3d 364, 367 (5th Cir. 1998) (internal quotation and citation omitted). "The border-search doctrine is one of those exceptions." Id. "Border searches, . . . from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." United States v. Ramsey, 97 S.Ct. 1972, 1980 (1977) (international mail case). "The historically recognized scope of the border-search doctrine suggests no distinction in constitutional doctrine stemming from the mode of transportation across our borders. Id. at 1981.

"The border search doctrine is applicable to stops and searches conducted at the 'functional equivalent' of the border, *i.e.*, the first point at which an entrant may practically be detained." United States v. Cardenas, 9 F.3d 1139, 1147 (5th Cir. 1993). The "point where a ship first docks in this country after entering our territorial waters from abroad" is considered the "functional equivalent of the border." Id.; United States v. Prince, 491 F.2d 655 (5th Cir. 1974). In boat-search cases, the three-mile limit, which separates what is commonly referred to as "territorial waters" from what is known as "customs waters" or the "contiguous zone" is treated as the border of the United States. United States v. Garcia, 672 F.2d 1349, 1357 n.10 (11th Cir. 1982) (citing United States v. McPherson, 664 F2d 69, 72 (5th Cir. 1981)). "This boundary is

consistent with the government's exercise of sovereignty, which extends over territorial but not customs waters." Id. "Customs may inspect each individual or item as it enters our borders . . . with complete impunity," and there is no need to show that it "actually left foreign soil." United States v. MacPherson, 664 F.2d at 72 (boat case). "[T]he propriety of a border search rests on the 'critical fact' of whether or not a border crossing has occurred."[7] United States v. Stone, 659 F.2d at 573.

"[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." United States v. Montoya de Hernandez, 105 S.Ct. 3304, 3309 (1985). "[B]order searches are not subject to constitutional probable cause and warrant requirements." United States v. Moreno, 778 F.2d 719, 721 (11th Cir. 1985). "[T]he 'border search' exception is not based on the doctrine of 'exigent circumstances' at all. It is a longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained, and in this respect is like the similar 'search incident to lawful arrest' exception.'" United States v. Ramsey, 97 S.Ct. at 1981. "Under the border-search doctrine, government agents may conduct a 'routine search' at the international border or its functional equivalent without probable cause, a warrant, or any suspicion to justify the search." United States v. Rivas, 157 F.3d at 367. "Routine searches are generally classified as those which do not seriously invade a traveler's privacy." Id. (internal quotation omitted); see United States v.

---

[7] "The sea border is an imaginary line in the ocean that bends and twists to follow an ever changing coast." United States v. MacPherson, 664 F.2d at 72. "The sea border has no fixed entry points like its land counterpart; no natural or manmade objects mark its path." Id. at 73. "A vessel's position relative to the border can only be estimated; it cannot be determined precisely." Id.

Cardenas, 9 F.3d at 1148 n.3 (identifying as "routine" searches of vehicle, luggage, outer clothing, personal effects, purse, and wallet). "A stop and search that is not 'routine' requires a 'reasonable suspicion of wrongdoing to pass constitutional muster.'" Id. "[R]easonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border." United States v. Arnold, 523 F.3d 941, 947 (9th Cir. 2008).

Pickett's argument that his trip aboard the supply vessel originated from a federal enclave begs the question whether Pickett crossed a border entering the United States and was subject to a border search. See United States v. Stone, 659 F.2d 569, 573 (5th Cir. 1981) ("in no case has a border search been invalidated because the object's departure from foreign soil was not demonstrated."). Pickett boarded the supply vessel and traveled in international waters approximately 30 miles before entering the territorial waters of the United States three miles from its coastline. Pickett then docked in Venice, which is the functional equivalent of the border.

The critical fact that determines that Pickett was subject to a border search is that Pickett crossed the border from international waters before arriving in the United States. In United States v. Peabody, 626 F.2d 1300, 1301 (5th Cir. 1980), the Court of Appeals affirmed a conviction for conspiracy to import marijuana based on the Coast Guard's seizure of contraband from a vessel in international waters off the coast of Florida. In the context of the sufficiency of the evidence to show intent to defraud, the Court of Appeals reasoned that it is "enough" that the defendant was apprehended "outside the country, heading in" and that the contraband was "meant to re-enter the United States from international waters." When Pickett entered the

territorial waters from international waters, he crossed the border of the United States.  He was subject to a border search upon docking at the port, the functional equivalent of a border.

Moreover, the court finds that the search was reasonable.  ICE agents received information that Pickett purchased subscriptions to child pornography websites.  Further, ICE agents had information that there was an outstanding warrant for Pickett's arrest in Terrebonne Parish for domestic violence.  The agents learned that Pickett was working offshore and met him at the dock when he returned to the United States.  The search of his laptops and electronic devices was a non-invasive routine search that did not require reasonable suspicion.

Accordingly, the search fell within the border-search exception to the warrant requirement of the Fourth Amendment, and the motion to suppress the evidence is denied.[8]

New Orleans, Louisiana, this 16th day of September, 2008.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

---

[8] Because of the court's findings and analysis of the border-search doctrine, the court does not address whether images obtained from the computer search after a warrant was obtained and statements made to ICE agents were the "fruits of the poisonous tree" obtained in violation of the Fourth Amendment.  See Wong Sun v. United States, 83 S.Ct. 407, 416 (1963).